**WARDENSKI P.C.**
134 West 29th Street, Suite 709
New York, NY 10001
(347) 913-3311
Joseph J. Wardenski (*pro hac vice*)
joe@wardenskilaw.com

**FRANKEL SYVERSON PLLC**
2375 E. Camelback Road, Suite 600
Phoenix, Arizona 85016
602-598-4000
Ty D. Frankel (AZ#027179)
ty@frankelsyverson.com

**FRANKEL SYVERSON PLLC**
9655 Granite Ridge Drive, Suite 200
San Diego, California 92123
602-598-4000
Patricia N. Syverson (AZ#020191)
patti@frankelsyverson.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Kaden Vitellaro,<br><br>            Plaintiff,<br><br>  v.<br><br>State of Arizona,<br><br>            Defendant. | Case No. 4:25-cv-00366-RCC<br><br><br>**AMENDED COMPLAINT**<br><br><br>[Jury Trial Demanded] |

## INTRODUCTION

1.    Plaintiff Kaden Vitellaro, a transgender man, brings this employment discrimination lawsuit against his former employer, Defendant State of Arizona (the "State" or "Defendant"), for subjecting him to pervasive and ongoing discrimination and harassment for the duration of his employment as a correctional officer at the Arizona Department of Corrections, Rehabilitation and Reentry ("ADCRR") (formerly known as

1  the Arizona Department of Corrections). On July 5, 2018, Mr. Vitellaro was forced to resign
2  to escape the hostile and unsafe environment created by ADCRR and its officials at the
3  Arizona State Prison Complex-Tucson ("ASPC-Tucson"), a men's prison and the largest
4  correctional facility in Arizona.

5      2.    Mr. Vitellaro, at a friend's recommendation, applied to ADCRR to work as a
6  correctional officer in mid-2017, excited by the prospect of a law enforcement career.
7  When he was offered the job, he looked forward to the professional opportunities, job
8  stability, and the generous pay and benefits he would receive as a State employee.

9      3.    By the time he pursued State employment at ADCRR, Mr. Vitellaro was both
10  legally male and lived and presented as male in all aspects of his life. Before he applied to
11  work at ADCRR, Mr. Vitellaro, who was assigned female at birth but always knew that he
12  was male, had transitioned to living as a man in accordance with his male gender identity.
13  His gender transition included legally changing his name to Kaden, obtaining a corrected
14  birth certificate reflecting his male sex, correcting the sex designation to "male" on his
15  federal Social Security records and his Arizona state-issued driver's license, and medical
16  treatments.

17      4.    At the time of his application for employment, Mr. Vitellaro preferred to keep
18  his transgender status private, sharing it only with close friends and family members. He
19  did not intend—and did not want—his transgender status or private medical history to be
20  disclosed in employment settings.

21      5.    Throughout Mr. Vitellaro's State employment, however, ADCRR officials
22  and superior officers refused to respect Mr. Vitellaro's male identity, taking various actions
23  that outed him as transgender in front of colleagues and inmates and put his safety at risk.
24  ADCRR also maintained and enforced policies that disallowed transgender correctional
25  officers from fully participating in training, development, and major day-to-day
26  responsibilities of the job. Cumulatively, these actions, policies, and protocols created a
27  hostile work environment and conditions of employment so intolerable that Mr. Vitellaro
28  was forced to resign.

6.     The discriminatory treatment began even before Mr. Vitellaro reported for training at the Correctional Officers Training Academy ("COTA" or the "Academy") on September 4, 2017. In a meeting before training commenced, COTA officials informed Mr. Vitellaro that he would be prohibited from using men's restrooms and would only be allowed to access and use a private restroom in a dormitory room located in a separate building from his classes. COTA enforced that requirement throughout Mr. Vitellaro's time at the Academy.

7.     As part of COTA, Mr. Vitellaro and other cadets in his cohort participated in an on-site training at ASPC-Tucson, which involved interactions with inmates and ASPC-Tucson staff. After one of Mr. Vitellaro's instructors, a correctional officer at ASPC-Tucson, learned that Mr. Vitellaro was transgender, the officer persistently misgendered him as female. The officer repeatedly referred to Mr. Vitellaro as "she" and "her" to other cadets, officers, and inmates, intentionally demeaning Mr. Vitellaro and disclosing his private transgender status to others. The officer ignored Mr. Vitellaro's repeated requests to stop singling him out and treating him differently than other cadets in this deliberately degrading manner.

8.     When Mr. Vitellaro formally complained to ADCRR about the officer's conduct, ADCRR dismissed the complaint without taking any formal action against the officer.

9.     After Mr. Vitellaro graduated from COTA on October 20, 2017, he was dismayed to learn that his initial assignment was to the same unit at ASPC-Tucson where the officer who harassed him during training worked. ADCRR made this initial placement even before completing its inquiry into Mr. Vitellaro's pending discrimination complaint against that officer.

10.     Mr. Vitellaro expressed concern to ADCRR officials about working with this officer, including his concern that he would be outed as transgender to other prison staff and inmates by the officer, and requested placement in one of the seven other men's residential units at ASPC-Tucson. Rather than honoring this request, ADCRR reassigned

1   Mr. Vitellaro to the prison's Complex Unit ("Complex"), an administrative unit with

2   minimal inmate contact, which is typically staffed by senior employees. No other

3   correctional officer in Mr. Vitellaro's training cohort was placed at Complex.

4       11.   ASPC-Tucson officials explained to Mr. Vitellaro that he was placed at

5   Complex because, as a transgender man, he would need to comply with gender-specific

6   requirements for *female* correctional officers if he were placed on a residential unit. This

7   would include being required to comply with ADCRR's "knock-and-announce"

8   requirement by shouting "female on the run" every time he entered a men's unit, despite

9   Mr. Vitellaro's legal sex being male, his designation as "male" in his ADCRR personnel

10  records, and ASPC-Tucson's knowledge that he is a transgender man.

11      12.   As a result of this discriminatory policy, Mr. Vitellaro was denied the

12  essential on-the-job training opportunities given to everyone else in his training cohort,

13  who were all assigned to residential units, interacted regularly with inmates, and performed

14  the full scope of duties expected of correctional officers at the prison. Mr. Vitellaro

15  experienced hostility from, and felt ostracized by, his Complex colleagues and other

16  officers for being placed in Complex as a junior officer.

17      13.   In May 2018, ASPC-Tucson's new warden, Juli Roberts, after learning that

18  Mr. Vitellaro is transgender, informed him in a meeting that he would be reassigned to a

19  men's residential unit and that, as a condition of continued employment, he would be forced

20  to comply with the directive that he falsely announce "female on the run" whenever he

21  entered the men's unit. Roberts made these directives despite her knowledge that Mr.

22  Vitellaro is a transgender man.

23      14.   Mr. Vitellaro objected, explaining to Roberts that he is a man and that

24  complying with this requirement would be humiliating, reveal his transgender status to

25  staff and inmates who would otherwise not know it, and expose him to the risk of

26  harassment and violence.

27      15.   Roberts ignored Mr. Vitellaro's concerns. First, immediately after the May

28  meeting, Roberts removed Mr. Vitellaro from his Complex assignment and temporarily

4

1   reassigned him to ASPC-Tucson's Mail and Property Unit, a less desirable post with limited

2   duties, without explanation. After several weeks, Roberts notified Mr. Vitellaro that he

3   would be placed in the prison's Santa Rita Unit, a men's residential unit, beginning on June

4   23, 2018. She reiterated that he would need to comply with the discriminatory knock-and-

5   announce mandate, stating that ADCRR considered him to be female because of what was

6   "below [his] waist," a reference to Mr. Vitellaro's genitalia.

7       16.    Mr. Vitellaro, fearful for his safety if he began work at the Santa Rita Unit,

8   retained an attorney to explore options for his protection, including being exempted from

9   the knock-and-announce requirement or being returned to Complex. ADCRR ignored his

10  attorney's requests and failed to offer any alternatives.

11      17.    Faced with no other choice, rather than beginning work at Santa Rita on June

12  23, 2018, Mr. Vitellaro used up all his remaining leave time. On July 5, 2018, after

13  depleting his leave, he had no choice but to resign rather than report to work and face the

14  discriminatory, unsafe, and intolerable conditions imposed on him by ADCRR. In a

15  resignation letter and an online exit survey, Mr. Vitellaro explained that, although he wished

16  to remain employed at ADCRR, he was unable to accept the "risk for further harassment

17  both emotional and physical" that complying with the knock-and-announce policy and

18  misrepresenting himself as female to his colleagues and male inmates would cause him.

19  Referencing the involuntary disclosure of his transgender status to other prison staff and

20  inmates by other correctional officers, and the hostile environment he experienced

21  throughout his employment at ADCRR, Mr. Vitellaro added, "I have already been

22  compromised and I no longer feel accepted or safe in doing my job due to my gender

23  identity."

24      18.    Mr. Vitellaro brings this civil rights lawsuit against the State under Title VII

25  of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), for employment

26  discrimination because of sex, including subjecting him to differential treatment in the

27  terms and conditions of his employment and subjecting him to a hostile work environment

28  because of sex, resulting in his constructive discharge on July 5, 2018. He seeks

1  compensatory damages in an amount sufficient to compensate him for the severe emotional

2  distress, humiliation, embarrassment, lost career opportunities, and other injuries resulting

3  from the Title VII violations; front pay to compensate him for lost wages and benefits; and

4  his reasonable attorneys' fees and costs, including expert witness fees.

5                                              **PARTIES**

6        19.    Plaintiff Kaden Vitellaro is an adult resident of Tucson, Pima County,

7  Arizona. Mr. Vitellaro was employed by the State as a correctional officer with ADCRR

8  from September 4, 2017, to July 5, 2018. After completing COTA training in Tucson on

9  October 20, 2017, Mr. Vitellaro worked at ASPC-Tucson, a men's prison in Tucson

10  operated by ADCRR, for the remaining duration of his employment.

11       20.    Mr. Vitellaro is a transgender man. Although he was assumed to be female at

12  birth, his gender identity is male, he looks like a man, and he has lived all aspects of his

13  life as a man for many years, including at all times relevant to this complaint. Mr.

14  Vitellaro's legal sex, as reflected since 2016 on his Arizona state driver's license and

15  corrected birth certificate, is male. In 2016, prior to seeking State employment, Mr.

16  Vitellaro obtained a court-ordered name change to Kaden, a traditionally male first name,

17  from his previous, traditionally female first name.

18       21.    Defendant State of Arizona refers to the State "and any [S]tate agency, board,

19  commission, or department," A.R.S. § 12-820(8), including ADCRR. The State, through

20  ADCRR, was Plaintiff's employer at all relevant times. The State capital is in Phoenix,

21  Maricopa County, Arizona.

22       22.    ADCRR, known until January 2020 and at all relevant times as the Arizona

23  Department of Corrections, is a department of the State. ADCRR was established by the

24  Arizona State Legislature under A.R.S. § 41-1601 *et seq.*, and is headquartered in Phoenix,

25  Maricopa County, Arizona. Under Arizona state law, ADCRR is the State's department of

26  corrections and "ha[s] as its purpose the objective of encompassing the various institutions,

27  facilities and programs which are now or may become a part of the correctional program

28  of the state, and to provide the supervisory staff and administrative functions at the state

1  level of all matters relating to the institutionalization, rehabilitation and community

2  supervision functions of all adult offenders." A.R.S. § 41-1602.

3    23.    ADCRR operates COTA, which provides all pre-service training for ADCRR

4  correctional officers. The COTA campus is located at 5601 West Trails End Road in

5  Tucson, Pima County, Arizona.

6    24.    ADCRR operates ASPC-Tucson, located at 10000 South Wilmot Road in

7  Tucson, Pima County, Arizona, the largest ADCRR correctional facility in Arizona. ASPC-

8  Tucson is a men's prison with eight residential units and an administrative unit known as

9  "Complex." ASPC-Tucson has over 5,000 inmates and over 1,600 staff.

10    25.    At all relevant times, Defendant has employed over 500 employees.

11  Defendant is subject to Title VII.

12  **JURISDICTION AND VENUE**

13    26.    This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a).

14    27.    Venue is proper in this District under 28 U.S.C. § 1391(b) because all parties

15  reside in this District and a substantial part of the events or omissions giving rise to

16  Plaintiff's claims arose in this District.

17    28.    Under Rule 77.1 of the Local Rules of Civil Procedure, assignment of this

18  case to the Tucson Division is proper because Plaintiff's claims arose in this Division.

19  **FACTS**

20  **I.    DEFENDANT HIRES MR. VITELLARO AS A CORRECTIONAL
    OFFICER IN SUMMER 2017**

21

22    29.    On June 30, 2017, Mr. Vitellaro applied to ADCRR for a correctional officer

23  position.

24    30.    When Mr. Vitellaro applied, he believed the job was a good match for his

25  interests. He was excited by the prospect of a long-term career with ADCRR and the

26  associated pay, generous state employee benefits, and job stability. After working several

27  years in low-wage warehouse jobs, Mr. Vitellaro looked forward to the better pay and

28  benefits he would receive as a correctional officer.

1    31.    On or about July 12, 2017, ADCRR extended Mr. Vitellaro a conditional job

2  offer for the position of Correctional Officer I ("CO I"), with a starting salary of $31,885,

3  plus benefits.

4    32.    Mr. Vitellaro accepted this offer on July 12, 2017.

5    33.    The conditional offer was contingent on Mr. Vitellaro's successful

6  completion of a required fitness test, pre-employment job screening, medical/physical

7  examination, psychological examination, and background investigation. During this

8  process, Mr. Vitellaro was required to provide information, including his former name,

9  court-ordered name change, and medical history, that revealed his transgender status to

10  ADCRR.

11    34.    Mr. Vitellaro passed the background investigation and fulfilled the other pre-

12  employment requirements.

13    35.    At all relevant times, Mr. Vitellaro's sex designation in ADCRR's personnel

14  records was "M" or "male."

15    36.    For the duration of his State employment with ADCRR, from September 4,

16  2017, to July 5, 2018, Mr. Vitellaro was required to and did participate in a mandatory State

17  retirement program. He was also eligible for and did receive health, dental, and other

18  insurance benefits from the State during this period.

19  **II.    MR. VITELLARO'S EXPERIENCES AT THE CORRECTIONAL**
20  **OFFICER TRAINING ACADEMY**

21    37.    Mr. Vitellaro's employment with ADCRR started on September 4, 2017,

22  when he began the seven-week pre-service training at the Academy.

23    38.    The seven-week training academy took place primarily on COTA's campus

24  in Tucson, a multi-building complex with educational buildings, dormitories, and

25  recreational facilities. The program also included a one-week on-the-job training

26  component at ASPC-Tucson.

27    39.    On his first day of employment on September 4, 2017, Mr. Vitellaro

28  completed ADCRR's "Employee Information" form, providing his contact information,

1  demographic information, and emergency contact information. In the field that requested

2  his "Gender," Mr. Vitellaro selected "Male."

3  ***ADCRR Officials Impose Discriminatory Restrictions on Mr. Vitellaro at COTA***

4      40.    Before his academy training began, Mr. Vitellaro was summoned to a

5  meeting with COTA Commander Therese Schroeder and other ADCRR officials. At that

6  meeting, the officials made clear to Mr. Vitellaro that, despite his legal male sex, COTA

7  and ADCRR would not respect his male identity during the training. First, they told Mr.

8  Vitellaro that he would need to adhere to the dress code for female cadets, not male cadets.

9  Second, they told Mr. Vitellaro that he would be required to use women's restrooms and

10  shower facilities at COTA and would be prohibited from using men's facilities.

11      41.    Upon receiving this information, Mr. Vitellaro was concerned that

12  compliance with these demeaning and humiliating directives would involuntarily disclose

13  his transgender status and private medical history to other cadets, staff, and inmates during

14  on-site trainings, since he is a man, appears to be a man, and did not intend to disclose his

15  transgender status or private medical history to anyone at ADCRR when he began his

16  employment there.

17      42.    At the meeting, Mr. Vitellaro objected to these directives, explaining that he

18  was a man, not a woman, and that following the female dress code and using women's

19  facilities would be impossible for him.

20      43.    In response to Mr. Vitellaro's objections, COTA officials assigned Mr.

21  Vitellaro to a single dormitory room with a private restroom and ordered him to use that

22  dorm room whenever he needed to use the restroom or change clothes. The officials forbade

23  Mr. Vitellaro from using any other restrooms on campus. The dorm room was in a

24  residential building separate from COTA's instructional buildings.

25      44.    Mr. Vitellaro, who lived nearby and commuted from home during the training

26  academy, did not otherwise have a need for a dorm room.

27      45.    The day before COTA began on September 4, 2017, COTA notified incoming

28  cadets that it had adopted a standard non-gendered dress code for all cadets.

46.    For the duration of COTA, while all the other cadets and staff were able to use the sex-specific restrooms located adjacent to the classrooms, Mr. Vitellaro was forced to go to the dormitory in a different part of campus, located some distance from his classes, whenever he needed to use the restroom.

47.    ADCRR's restroom policy for Mr. Vitellaro drew unwanted questions and attention from other cadets and, on several occasions, caused him to be late to class and miss instructional time.

**Mr. Vitellaro Experiences Harassment by Supervising Officer During COTA's On-the-Job Training at ASPC-Tucson**

48.    As part of COTA, Mr. Vitellaro and his training cohort participated in an on-the-job training at ASPC-Tucson in the prison's Winchester Unit, a men's residential unit. Instructors during the on-the-job training included Correctional Officer II ("CO II") Saul Miller, a correctional officer at ASPC-Tucson.

49.    Part of the on-the-job training included conducting strip searches on male inmates.

50.    On September 28, 2017, Miller asked Mr. Vitellaro and his fellow cadets if they were comfortable conducting strip searches.

51.    At some point before this, ADCRR officials had informed Mr. Vitellaro that, under ADCRR policy, he would be prohibited from strip searching male inmates because he is transgender.

52.    Mr. Vitellaro asked to speak with Miller privately and informed Miller that he had been instructed that he could not to strip search male inmates because he is transgender. This is the first time Mr. Vitellaro disclosed his transgender status to anyone at ASPC-Tucson, and he made the confidential disclosure to comply with what he understood to be ADCRR policy.

53.    Once Mr. Vitellaro confidentially disclosed his transgender status to Miller, however, Miller failed to respect Mr. Vitellaro's wish to keep this disclosure of his transgender status private. He immediately began to intentionally and repeatedly out Mr.

1   Vitellaro as transgender and to treat him in a deliberately demeaning and hostile manner
2   by referring to Mr. Vitellaro as "she" and "her" when speaking with other correctional
3   officers and training cadets, none of whom were previously aware that Mr. Vitellaro is
4   transgender. In at least one incident in the chow hall, Miller referred to Mr. Vitellaro as
5   "she" and "her" in the presence of inmates.

6       54.    Before Mr. Vitellaro disclosed his transgender status to Miller, Miller had
7   consistently and correctly referred to Mr. Vitellaro as "he" and "him."

8       55.    Mr. Vitellaro corrected Miller each time that he referred to him incorrectly as
9   "she" and "her," conveying that this was unacceptable and could not happen again.
10  However, Miller intentionally continued to refer to Mr. Vitellaro with inaccurate female
11  pronouns even after Mr. Vitellaro's repeated requests that he stop.

12      56.    Miller's harassment made Mr. Vitellaro uncomfortable, embarrassed, and
13  unsafe. He had not previously disclosed his transgender status to his colleagues or any
14  inmates, who had no reason to know this information, and did not intend to do so. Mr.
15  Vitellaro was concerned and became increasingly distressed that his safety would be put at
16  risk if his transgender status became more widely known in the prison.

17      57.    On October 4, 2017, Mr. Vitellaro filed an internal report with ADCRR's
18  Equal Opportunity Unit, formally complaining about Miller's intentionally discriminatory
19  and hostile conduct. In the subject line of the report form, Mr. Vitellaro wrote, "Safety
20  Issue/Confidential." In the narrative section of the report, Mr. Vitellaro wrote:

21      Ever since I disclosed [my transgender status] to CO II Miller, he started to
22      refer to me as she/her when speaking about me to other cadets and officers. I
        corrected him multiple times. Before disclosing that information to CO II
23      Miller he called me by the correct pronoun (he/him). In the chow hall while
        another officer was helping me with count CO II Miller referred to me as she
24      and I corrected him and told him that couldn't happen. He apologized but
        immediately did it again.
25
        . . .
26
        The next day on 09/29/2017 at Tucson Complex, Winchester Unit on my
27      second day of my [on-the-job training] while doing an exterior perimeter
        check with two fellow cadets from Class 1096 who are not aware of my
28

1   status, I am <u>almost</u> <u>positive</u> that CO II Miller used the wrong pronoun (she/her) in front of them.

2   58.    On October 31, 2017, Rachel L. Theodore, a Senior Equal Employment

3   Opportunity Coordinator at ADCRR, sent Mr. Vitellaro a memorandum stating that the

4   Equal Opportunity Unit "has concluded its review of this matter" and that ADCRR "has

5   utilized appropriate measures to address this matter." The memorandum did not specify

6   those measures.

7   59.    In internal correspondence that same day, however, ADCRR officials

8   indicated that there was no meaningful response to Mr. Vitellaro's complaint. In an email

9   with COTA and ASPC-Tucson officials, Theodore wrote she was "unable to conclude that

10  Cadet Vitellaro, now COII Vitellaro assigned to Tucson/Complex, has been subjected to

11  discriminatory actions as it relates to a protective [sic] characteristic." She noted that,

12  following a discussion with an ASPC-Tucson equal employment liaison, that liaison gave

13  Miller a one-page bullet-pointed list entitled "Examples of LGBT-Related Sex

14  Discrimination Claims" that Theodore had printed out from the United States Equal

15  Employment Opportunity Commission ("EEOC") website. The examples of "unlawful sex

16  discrimination" on that list included "[d]enying an employee equal access to a common

17  restroom corresponding to the employee's gender identity" and "[h]arassing an employee

18  because of a gender transition, such as by intentionally and persistently failing to use the

19  name and gender pronoun that correspond to the gender identity with which the employee

20  identifies, and which the employee has communicated to management and employees."

21  60.    Upon information and belief, ADCRR did not take any disciplinary action

22  against Miller based on Mr. Vitellaro's complaint.

23  61.    Mr. Vitellaro graduated from COTA on October 20, 2017.

24

25

26

27

28

12

### III.   MR. VITELLARO EXPERIENCES ONGOING AND PERVASIVE DISCRIMINATION DURING HIS TIME AS A CORRECTIONAL OFFICER AT ASPC-TUCSON

62.     Upon graduation from COTA, Mr. Vitellaro was promoted from CO I to CO II and was transferred to his initial assignment at ASPC-Tucson. The promotion was accompanied by a salary increase to $32,916 annually.

63.     At the time of his transfer, on October 23, 2017, Mr. Vitellaro completed a new ADCRR "Employee Information" form, again indicating his male sex.

***ADCRR Initially Assigns Mr. Vitellaro to Work on the Same Unit as the Supervising Officer Who Harassed Him During the COTA On-Site Training***

64.     Mr. Vitellaro was initially informed that he would be assigned to ASPC-Tucson's Winchester Unit, a men's residential unit. That was the same unit where he completed on-the-job training during COTA and where CO II Miller worked.

65.     At that time, Mr. Vitellaro's complaint about Miller to ADCRR's Equal Opportunity Unit was pending and he had not yet received notification that the matter was resolved.

66.     When Mr. Vitellaro learned that he was assigned to the same unit as Miller, he was concerned that Miller would continue to harass him, incorrectly refer to him as "she" and "her," and disclose his transgender identity to other officers and inmates. Based on Miller's recent conduct during COTA, which remained the subject of Mr. Vitellaro's still-pending discrimination complaint, Mr. Vitellaro was concerned that, if that conduct continued or worsened, his transgender status would become more widely known, not just in the Winchester Unit, but elsewhere in the prison as well, and that such disclosure would expose him to a heightened risk of harassment, violence, and other mistreatment.

67.     Before beginning work in the Winchester Unit, Mr. Vitellaro expressed these concerns to a supervisor and explained his discomfort with working in the same unit as Miller because of Miller's persistent harassment of him. He requested placement in one of the other seven residential units at ASPC-Tucson to avoid working directly with Miller.

***After Mr. Vitellaro Expresses Concerns About Working with the Officer Who Harassed Him, ADCRR Reassigns Him to the Administrative "Complex" Unit***

68.    Before beginning work at the Winchester Unit, Mr. Vitellaro's initial assignment was changed to Complex, ASPC-Tucson's administrative unit.

69.    New correctional officers were not typically assigned to Complex, which involves little to no inmate contact. The unit is typically staffed by more senior officers who have already had significant experience working in residential units.

70.    Mr. Vitellaro was the only member of his training cohort placed at ASPC-Tucson who was not assigned to work in one of the prison's eight men's residential units.

71.    Mr. Vitellaro understood that the ASPC-Tucson warden and deputy warden were aware of and approved his placement at Complex.

72.    Initially, prison officials did not explain to Mr. Vitellaro why he was being placed in Complex. Only later, in November or December 2017, Mr. Vitellaro learned from a supervising officer that he had been placed on Complex because of an ADCRR policy that would require him, as a transgender man, to comply with the prison's knock-and-announce policy and shout "female on the run" before entering any men's residential unit if he were assigned to work on such a unit.

73.    When new correctional officers are assigned to ASPC-Tucson, they continue to receive on-the-job training for their first thirty days on the job, including how to perform essential job duties related to the supervision of inmates.

74.    Unlike every other member of his COTA cohort placed at ASPC-Tucson, because he was placed in Complex, Mr. Vitellaro never received this critical training on working with inmates. His on-the-job training was limited to the administrative duties performed by Complex staff, which involved minimal contact with inmates and no work on residential units. As a result, Mr. Vitellaro was denied essential skills development and professional development opportunities afforded to all other new correctional officers.

75.    From late October 2017 through May 17, 2018, Mr. Vitellaro worked exclusively in Complex.

76.     Mr. Vitellaro's placement at Complex drew unwanted attention to him, sparked rumors about his gender identity among prison staff, and exposed him to unwelcome questions and comments from colleagues about his sex and gender identity. Throughout his placement at Complex, he was aware that other Complex staff and correctional officers elsewhere in the prison were talking about him and discussing his transgender status behind his back. Another correctional officer told him that "everyone" knew he was transgender, causing him distress and fear of further mistreatment.

***Prison Officials Inform Mr. Vitellaro, a Man, that ADCRR Policy Required Them to Treat Him as a Woman***

77.     On multiple occasions throughout his employment, ADCRR officials told Mr. Vitellaro that ADCRR policy required that they treat him as a woman because he is transgender.

78.     Under a written ADCRR policy, which remains in effect today, ADCRR classifies correctional officers based on their "genitalia and breasts," not their legal sex or gender identity. The ADCRR policy states the following:

> Due to gender specific job requirements (bona fide occupational qualifications), such as the need to search or observe the personal bathroom activities of inmates, applicants must possess the sexual characteristics of only one gender. Sexual characteristics refer to genitalia and breasts.

79.     The policy further requires all correctional officer applicants "who may identify with a gender that is different from their designated gender at birth, or who otherwise possess the sexual characteristics of more than one gender, to disclose this information to [ADCRR's] Occupational Health Administrator . . . at the time of application."

80.     The policy claims that the federal Prison Rape Elimination Act ("PREA"), a law designed to protect inmates from sexual assault, requires ADCRR to classify transgender employees based on their genitalia or breasts.

81.     In relevant part, PREA regulations prohibit "cross-gender strip searches or cross-gender visual body cavity searches" and "cross-gender pat-down searches of *female*

1    inmates," and requires prisons to "implement policies and procedures that enable inmates

2    to shower, perform bodily functions, and change clothing without nonmedical staff of the

3    opposite gender viewing their breasts, buttocks, or genitalia," including a requirement that

4    correctional officers of a sex different from those in a prison unit announce themselves

5    upon entry to an area of that unit where inmates may be disrobed, colloquially referred to

6    as the "cover-up" or "knock-and-announce" rule. 28 C.F.R. §§ 115.15(a)-(b), (d) (emphasis

7    added).

8         82.    Although PREA imposes certain limitations on "cross-gender" pat-downs,

9    strip searches, and inmate supervision, PREA, the PREA Standards published by the U.S.

10   Department of Justice ("DOJ") (the agency that enforces PREA), and the operative

11   interpretive guidance promulgated by DOJ, does not require a prison to treat a transgender

12   correctional officer as a sex conflicting with the officer's gender identity.

13        83.    Rather, the operative PREA guidance in effect during Mr. Vitellaro's

14   employment expressly, which was published on April 23, 2014, stated that a prison should

15   *not* assume that an officer's sex is the officer's sex assigned at birth. That guidance contains

16   the following question and answer, explaining that the determination of a transgender

17   correctional officer's sex should be based on an individualized determination that considers

18   the officer's gender identity:

19       Q: What gender should transgender staff be considered for the purposes of
20       complying with cross-gender viewing and search prohibitions established in
         standard 115.15?

21       A: Facilities should verify whether there are any specific legal authorities,
22       statutes, or personnel policies that may be relevant to this determination.
         Absent any specific authorities, *facilities should make an individualized*
23       *determination based on the identified gender of the staff member*, and not
         solely on the basis of the biological gender. This decision should be made at
24       the request of, and in conjunction with, the transgender staff member. The
         determination may also change during the course of employment, as part of
25       an on-going adjustment process, or as the staff member gains real-life
26       experience living as a person of the identified gender.

27   U.S. Dep't of Justice, Nat'l PREA Resource Center, Frequently Asked Questions (Aug.

28   23, 2014) (emphasis added).

84.    Contrary to DOJ's PREA guidance, ADCRR made no individualized determination of what gender Mr. Vitellaro should be considered for purposes of compliance with PREA's cross-gender restrictions. Instead, even though PREA did not require it, ADCRR officials unilaterally decided that Mr. Vitellaro's sex was "female," ignoring his legal sex of male, his male gender identity, and his own clearly communicated request to be treated as male. ADCRR's decision to treat Mr. Vitellaro as "female" was not, contrary to PREA guidance, "made at the request of, and in conjunction with," Mr. Vitellaro.

85.    Moreover, ADCRR's refusal to permit Mr. Vitellaro to conduct pat-down searches on male inmates because he is a transgender man was not required by PREA. In fact, PREA contains no prohibition on cross-gender pat-down searches of *male* inmates. PREA's pat-down restrictions only apply to female inmates.

### *ASPC-Tucson's New Warden Demands that Mr. Vitellaro Comply with Discriminatory and Dangerous Policies, Including Falsely Identifying Himself as a Woman to Male Inmates, as a Condition of Continued Employment*

86.    In or around May 2018, Mr. Vitellaro met with Juli Roberts, who had recently become the ASPC-Tucson warden, seeking her assistance in obtaining a waiver of ADCRR's requirement that male correctional officers shave their facial hair. ADCRR permits medical waivers of this requirement.

87.    Mr. Vitellaro applied for this waiver because maintaining facial hair alleviated his clinical symptoms of gender dysphoria and related anxiety about being misperceived as female. Mr. Vitellaro submitted medical documentation from his treating medical providers in support of his request for a waiver. ADCRR denied his request.

88.    In the meeting with Roberts in May 2017, Mr. Vitellaro disclosed his transgender status in renewing his request for a waiver of the grooming requirement. Roberts agreed to grant the waiver but, to Mr. Vitellaro's surprise, she quickly changed the subject and declared that he should not have been assigned to Complex as a new correctional officer and would need to be reassigned immediately.

89.     On May 17, 2018, Roberts summarily removed Mr. Vitellaro from Complex, where he had worked without issue for over six months, and reassigned him to a temporary post in the prison's Mail and Property Unit, which primarily involved reviewing inmate mail. This was a far less desirable position than either his full-duty assignment at Complex or an assignment to a residential unit. In her memorandum announcing the reassignment, Roberts wrote, "[e]ffective immediately, you are being assigned to Complex Mail & Property until further notice," ordering him to report to a new supervisor, without any additional explanation.

90.     Around or after the time of this reassignment, Roberts told Mr. Vitellaro that he would be subsequently reassigned to a men's residential unit once she evaluated the prison's staffing needs. She told him that, as a condition of his continued employment, he would be required to comply with the knock-and-announce requirement and shout "female on the run" whenever he entered such a unit. She further reiterated that, because he is a transgender man, he would be prohibited from conducting any pat-downs or conducting strip searches of male inmates.

91.     Mr. Vitellaro objected, explaining to Roberts that he is a man, not a woman, and that being forced to repeatedly misgender himself as female would be demeaning and humiliating. He conveyed his fear that complying with the knock-and-announce requirement would also expose him to considerable risk, including making him a target for harassment and violence. He also conveyed his discomfort with the involuntary disclosure of his transgender status to prison staff and inmates who had no need to know that information. He asked that he either not be required to comply with the knock-and-announce requirement or, in the alternative, that he be returned to his previous assignment to Complex. Roberts ignored Mr. Vitellaro's requests.

92.     In at least one meeting with Mr. Vitellaro about this issue, Roberts asked Mr. Vitellaro invasive and embarrassing questions about his medical gender transition, his genitalia, whether he had obtained or planned to receive genital surgery, and other private details about his transition, medical history, and anatomy that bore no relation to his job.

1    Mr. Vitellaro was humiliated and deeply distressed by these questions and being forced to

2    discuss his genitalia with his warden.

3    93.    On June 1, 2018, Roberts escalated the issue by email to an ADCRR

4    employee relations officer and another ADCRR administrator, in which she derisively

5    referred to Mr. Vitellaro as "him" in quotation marks, stating:

6
7    This is the transgender Officer who is assigned in complex mail property
     (administrative assignment). This employee stated that for 'him'
     transitioning will not include surgery on the lower genital area. In addition,
8    this employee does not agree with announcing if placed in the unit with
     inmates. How should I proceed on this issue?

9    94.    On June 11, 2018, Roberts told Mr. Vitellaro that he would be reassigned to

10   the Santa Rita Unit, a men's residential unit, effective June 23, 2018. She reiterated that, at

11   Santa Rita, Mr. Vitellaro would be required, as a condition of his continued employment,

12   to announce "female on the run" while on duty and when entering the unit.

13   95.    Roberts told Mr. Vitellaro that, after conferring with ADCRR headquarters,

14   it was "necessary" that he announce "female on the run" on men's units because of what

15   was "below [his] waist," a reference to Mr. Vitellaro's genitalia. Roberts stated to Mr.

16   Vitellaro that it was ADCRR's policy to determine an employee's sex based on their

17   "anatomy," and that Mr. Vitellaro was therefore considered to be "female" and required to

18   comply with sex-specific policies for female employees, including the knock-and-

19   announce requirement, the prohibition on conducting pat-downs and strip searches of male

20   inmates.

21   96.    Upon receiving this news, Mr. Vitellaro immediately experienced a panic

22   attack, felt physically sick, and began to experience severe emotional distress at the

23   prospect of having to comply with this directive after his transfer to the Santa Rita Unit.

24   97.    Mr. Vitellaro again conveyed to Roberts that he was a man, and that being

25   required to persistently state otherwise to inmates by shouting "female on the run" multiple

26   times a day would put his well-being, safety, and even life at risk.

27

28

1    ***Mr. Vitellaro Contests ASPC-Tucson's Discriminatory Directives and Unsuccessfully***
***Requests Nondiscriminatory Alternatives to Protect His Safety***

2    98.    To avoid the jeopardy to his safety and well-being, Mr. Vitellaro, through an

3    attorney, requested that ADCRR waive the requirement that he announce "female on the

4    run" to male inmates or, alternatively, that he be reassigned to Complex.

5    99.    In a telephone call with an ADCRR official on June 14, 2018, and a follow-

6    up email on June 15, 2018, Mr. Vitellaro's attorney explained that Mr. Vitellaro is legally

7    male and lives as a man in every aspect of his life, and that he compliance with an order

8    that he falsely identify himself as a woman would expose him to extreme personal risk.

9    100.    The attorney asked that the prison pause Mr. Vitellaro's reassignment and

10    allow him to remain in Complex or be assigned to another unit with minimal inmate contact

11    to avoid the risk to his safety that would arise if the reassignment to the Santa Rita Unit

12    proceeded as scheduled, with the knock-and-announce requirement in place.

13    101.    Following these requests, ADCRR prison officials failed to respond to either

14    Mr. Vitellaro or his attorney, and failed to otherwise change Mr. Vitellaro's scheduled

15    reassignment or offer other options to address his safety concerns, before his scheduled

16    reassignment to Santa Rita on June 23, 2018, or at any point thereafter.

17    102.    From June 23, 2018, the date of Mr. Vitellaro's scheduled reassignment to

18    the Santa Rita Unit, through July 4, 2018, Mr. Vitellaro took personal time off and sick

19    leave to avoid having to comply with ADCRR's discriminatory knock-and-announce

20    requirement.

21    ***Mr. Vitellaro's Resignation***

22    103.    After depleting the balance of his leave time, Mr. Vitellaro faced the

23    impossible choice of returning to work on July 5, 2018, where he would be forced to

24    comply with directives that would put him in harm's way, or resign. Since ADCRR had not

25    communicated any change in policy, or any willingness to reassign him to Complex, to

26    either him or his attorney, Mr. Vitellaro had no choice but to resign.

27

28

104.    On July 5, 2018, Mr. Vitellaro submitted a letter of resignation. In his letter, Mr. Vitellaro stated that he was resigning because, despite the fact that he is legally male, ADCRR's directive that he announce to other staff and inmates that he was "female" as a condition of continued employment was discriminatory, exposed him to continued harassment, and put his safety and well-being at risk.

105.    In his resignation letter, Mr. Vitellaro explained why he was forced to resign, writing:

> I have realized that even though I am transgender, and legally male, the state requires me to announce to staff and inmates that I am female due to my anatomy. This situation puts myself at risk for further harassment both emotional and physical. We tried to find a solution to solve this problem but unfortunately did not get a response. I would have liked to have continued my employment with Arizona Department of Corrections but because I feel that the company culture is not as I had expected, and the environment has been a difficult adjustment for me as I have already been compromised and I no longer feel accepted or safe in doing my job due to my gender identity. I was told starting my profession as a COII, that I would have equal job opportunities as any other male. This unfortunately has not been the case.

106.    Mr. Vitellaro also completed an online exit survey on July 5, 2018, where he communicated the same information. In the online survey, Mr. Vitellaro selected several options as reasons for his resignation, including "Safety concerns," "Negative work environment," "Difficult co-worker interactions," and "Concerns were not addressed." In an optional comment box, Mr. Vitellaro reiterated that the knock-and-announce requirement would expose him to intolerable safety risks, writing:

> I was forced to be put in a position where I would be unsafe around inmates due to having to announce female on the run though I am legally a transgender Male. Multiple meetings and attempts to try to find a solution with no response. I had to resign for my personal safety physically and mentally.

## IV.    DEFENDANT'S DISCRIMINATORY CONDUCT HAS CAUSED MR. VITELLARO SIGNIFICANT HARM

107.    As a direct and proximate result of Defendant's unlawful actions, Mr. Vitellaro has been and continues to be injured.

108.    Defendant's discriminatory actions have caused Mr. Vitellaro to experience embarrassment, stigma, exacerbated gender dysphoria, depression, and anxiety, substantial fear for his safety, and severe and ongoing emotional distress.

109.    As a direct and proximate result of Defendant's unlawful actions and discriminatory policies, Mr. Vitellaro also has experienced significant and ongoing financial injury. Following his constructive discharge, Mr. Vitellaro was unable to find comparable work. After a period of unemployment, he was forced to accept a temporary, low-wage job working in a warehouse in Tucson without air conditioning. As a result of losing his job at ADCRR, Mr. Vitellaro was forced to accept lower paying jobs with fewer benefits than he would have had as a correctional officer at ADCRR, forgoing the excellent retirement benefits, health insurance benefits, tuition reimbursement, and other benefits he received at ADCRR and expected to continue to receive as an employee there. Mr. Vitellaro was forced to accept work without the advancement potential or long-term job security he had expected as a ADCRR employee.

110.    Based on Defendant's actions, Mr. Vitellaro was denied professional development, advancement, and career opportunities afforded to ADCRR correctional officers who are not transgender.

## ADMINISTRATIVE EXHAUSTION

111.    On April 9, 2019, Mr. Vitellaro, through counsel, submitted a Charge of Discrimination (the "Charge") against ADCRR (then known as the Arizona Department of Corrections) to the United States Equal Employment Opportunity Commission ("EEOC"). The Charge was transmitted by facsimile to the director of the EEOC's Phoenix Field Office. The Charge alleged that ADCRR subjected Mr. Vitellaro to discriminatory treatment, harassment, and constructive discharge because of sex (including gender identity), in violation of Title VII.

112.    After being contacted by an EEOC investigator, Mr. Vitellaro signed a perfected Charge on April 29, 2019, which was cross-filed with the EEOC and the Arizona

1  Attorney General's Office, Civil Rights Division. The perfected Charge named the State of

2  Arizona as the respondent.

3       113.  The EEOC docketed the Charge as EEOC No. 540-2019-02529.

4       114.  On June 17, 2019, the Arizona Attorney General's Office, Civil Rights

5  Division, acknowledged receipt of the cross-filed Charge and indicated its intent to defer

6  investigation.

7       115.  The EEOC investigated the Charge.

8       116.  On June 12, 2019, ADCRR, in a letter from Rachel L. Theodore, the

9  department's Equal Opportunity Coordinator, submitted a position statement to the EEOC

10  in response to the Charge.

11       117.  The Arizona Attorney General's Office represented the State in the EEOC

12  investigation.

13       118.  Following an over five-year investigation, the EEOC, through its Las Vegas

14  Local Office, issued a determination letter on September 26, 2024. The EEOC concluded

15  that Mr. Vitellaro's charge was timely and that reasonable cause existed that the State,

16  through ADCRR, violated Mr. Vitellaro's rights under Title VII, writing:

> 17  Examination of the evidence obtained in the Commission's investigation,
> 18  including but not limited to, documents, testimony, and on-site
> inspection/interviews, supports a finding that there is reasonable cause to
> 19  believe that since at least 2017, Charging Party was subjected to unequal
> terms & conditions of employment and harassment that created a hostile
> 20  work because of his sex (gender identity/transgender status) [in] violation of
> Title VII.  The Commission further finds reasonable cause to believe that
> 21  Charging Party was constructively discharged due to the disparate treatment
> 22  and hostile work environment he was subjected to.

23       119.  The determination letter, which was transmitted to the Arizona Attorney

24  General's Office as counsel for the State, invited the parties to participate in conciliation to

25  seek a resolution of the case.

26       120.  Mr. Vitellaro agreed to attempt conciliation and, through counsel, sent a

27  confidential letter on October 9, 2024, sharing his proposed settlement terms.

28

1    121.    The EEOC failed to timely schedule a conciliation at any time prior to March
2    4, 2025.

3    122.    On March 4, 2025, Mr. Vitellaro, through counsel, requested a Notice of
4    Right to Sue to pursue his claims in court.

5    123.    Following that request, the EEOC determined that conciliation had failed and
6    referred the matter to DOJ's Civil Rights Division.

7    124.    On April 10, 2025, DOJ issued a "Notice of Right to Sue Within 90 Days"
8    (the "Notice") to Mr. Vitellaro, notifying him of his right to commence a civil action under
9    Title VII within 90 days of his receipt of the Notice.

10    125.    Mr. Vitellaro commenced this action on July 9, 2025, within 90 days of
11    receipt of the Notice.

12    126.    All other prerequisites to the filing of this suit have been met.

13                              **CAUSES OF ACTION**

14                          <u>**FIRST CAUSE OF ACTION**</u>
15    **Differential Terms and Conditions Because of Sex in Violation of
Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.***

16    127.    Plaintiff repeats and incorporates by reference all of the allegations set forth
17    above.

18    128.    Under Title VII, it is unlawful for an employer to "to fail or refuse to hire or
19    to discharge any individual, or otherwise to discriminate against any individual with respect
20    to his compensation, terms, conditions, or privileges of employment, because of such
21    individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). It is also unlawful for an employer to
22    "to limit, segregate, or classify his employees or applicants for employment in any way
23    which would deprive or tend to deprive any individual of employment opportunities or
24    otherwise adversely affect his status as an employee" on that same basis. 42 U.S.C. §
25    2000e-2(a)(2).

26    129.    By the actions described above, Mr. Vitellaro was continually subjected to
27    differential and inferior terms, conditions, and privileges of employment on the basis of

28

1    sex (including transgender status and sex stereotyping) throughout his time working for the

2    State as a correctional officer at ADCRR.

3    130.    Mr. Vitellaro has been, and continues to be, injured by Defendant's

4    discriminatory conduct, and has suffered damages as a result.

5    **SECOND CAUSE OF ACTION**

6    **Hostile Environment Harassment Because of Sex in Violation of**
     **Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.***

7    131.    Plaintiff repeats and incorporates by reference all of the allegations set forth

8    above.

9    132.    By the actions described above, Defendant subjected Plaintiff to severe,

10   pervasive, and persistent harassment on the basis of his sex (including transgender status

11   and sex stereotyping) resulting in a hostile work environment in violation of Title VII.

12   Throughout the course of his State employment with ADCRR, Plaintiff was persistently

13   and continually singled out and subject to intentional harassment and pervasive

14   discrimination because he is a transgender man, including being treated adversely by

15   supervisors and colleagues, being falsely referred to as female by supervisors, having his

16   transgender status and private medical history involuntarily disclosed to colleagues and

17   inmates, being subjected to invasive questions and remarks about his anatomy by the

18   ASPC-Tucson warden and others, being forced as a condition of continued employment to

19   falsely identify himself as female in front of inmates, and being continually subjected to

20   differential treatment, policies, and procedures than other COTA cadets and correctional

21   officers because he is transgender.

22   133.    The harassment to which Mr. Vitellaro was continually subjected as a

23   correctional officer caused him ongoing distress and fear for his safety and well-being,

24   humiliated him, and subjected him to a continuous and worsening hostile work

25   environment throughout his State employment with ADCRR. Defendant refused and/or

26   failed to take reasonable care to prevent and correct the harassment to which Mr. Vitellaro

27   was subjected.

28

1    134.    Mr. Vitellaro has been, and continues to be, injured by hostile work
2    environment he experienced, and has suffered damages as a result.

3                              **THIRD CAUSE OF ACTION**
4    **Constructive Discharge Because of Sex in Violation of**
     **Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e** *et seq.*

5    135.    Plaintiff repeats and incorporates by reference all of the allegations set forth
6    above.

7    136.    The disparate treatment and the hostile work environment to which Mr.
8    Vitellaro was subjected became so intolerable that he feared for his safety and well-being
9    if he continued going to work, giving him no choice but to resign.

10    137.    Although Mr. Vitellaro conveyed his objections about the unlawful treatment
11    and harassment to which he was subjected, Defendant made no efforts to correct the
12    situation or otherwise offer alternative arrangements to make his continued employment
13    possible. The conditions to which Mr. Vitellaro was subjected were so adverse that he could
14    no longer remain a State employee at ADCRR.

15    138.    The conditions to which Mr. Vitellaro was subjected were so intolerable that
16    a reasonable person would, under those circumstances, leave their job.

17    139.    Mr. Vitellaro has been, and continues to be, injured by his constructive
18    discharge, and has suffered damages as a result.

19                              **REQUEST FOR RELIEF**

20    WHEREFORE, Plaintiff Kaden Vitellaro respectfully requests that this Court:

21    (a)    award compensatory damages in an amount that would fully compensate him
22    for the emotional distress, out-of-pocket damages, lost opportunities, and other
23    compensable injuries that have been caused by Defendant's conduct;

24    (b)    award front pay in an amount that would fully compensate him for the lost
25    wages and benefits, including health benefits, retirement benefits, and educational benefits,
26    that he would have received as a State employee had he not been constructively discharged;
27

28

1    (c)    award Plaintiff his reasonable attorneys' fees and costs under 42 U.S.C.

2  § 1988; and

3    (d)    order such other declaratory, injunctive, and equitable relief as this Court

4  deems just and equitable.

5                        **DEMAND FOR TRIAL BY JURY**

6    Under Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all issues in this

7  case.

8

9    DATED:  August 11, 2025.

10

11                            **WARDENSKI P.C.**
                            By: */s/ Joseph J. Wardenski*
12                            Joseph J. Wardenski (*pro hac vice*)
                            134 West 29th Street, Suite 709
13                            New York, NY 10001

14                            **FRANKEL SYVERSON PLLC**
15                            Ty D. Frankel
                            2375 E. Camelback Road, Suite 600
16                            Phoenix, Arizona 85016

17
                            **FRANKEL SYVERSON PLLC**
18                            Patricia N. Syverson
                            9655 Granite Ridge Drive, Suite 200
19                            San Diego, California 92123

20
                            *Attorneys for Plaintiff Kaden Vitellaro*
21

22

23

24

25

26

27

28